IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 12, 2000 Session

## STATE OF TENNESSEE v. JOHN LEE HAMPTON

**Direct Appeal from the Circuit Court for Hardeman County**
**No. 6278     Jon Kerry Blackwood, Judge**

---

**No. W1999-00983-CCA-R3-CD - Filed December 6, 2000**

---

The defendant, John Lee Hampton, who was charged with two counts of rape, was convicted of two counts of statutory rape. The trial court imposed two concurrent one-year sentences, with all but sixty days suspended. In this appeal as of right, the defendant asserts that the evidence was insufficient. He also argues that the trial court erred by admitting certain photographs into evidence, by rehabilitating a juror, by denying his motion in limine to exclude evidence of uncharged sexual offenses involving the victim, by permitting the victim to testify in rebuttal regarding an uncharged sexual offense, and by refusing to suspend his entire sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed.**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Jeannie Kaess, Bolivar, Tennessee, for the appellant, John Lee Hampton.

Paul G. Summers, Attorney General & Reporter, Mark E. Davidson, Assistant Attorney General, and James W. Freeland, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The victim's[1] mother, Malinda Lawson, who acknowledged that the defendant had been a close friend of her family for approximately eight years, testified at trial that the defendant had visited her family's home in Bolivar and had watched television and eaten supper with her family. At some point, the victim, a 14-year-old male, expressed an interest in singing at his sister's dance recital at the end of April or the beginning of May in 1998. Because she knew that the victim would be nervous on stage, Ms. Lawson asked the defendant to sing with him. After the recital, the

---

[1]It is the policy of this court not to reveal the name of a minor who has been the victim of a sex crime.

defendant informed Ms. Lawson that he was a choir director at a church in Savannah and that he would like the victim to be involved with his choir. Ms. Lawson agreed. During the month of June, the defendant drove the victim to choir practice in Savannah six to eight times.

Ms. Lawson recalled that when she returned home from work on June 26, 1998, she received a call from a co-worker advising her that the victim was trying to find her. Immediately thereafter, she received a call from the victim, whom she described as hysterical and screaming. The victim asked for transportation home. Ms. Lawson directed her eldest son and two of his friends to drive to the defendant's residence to find the victim. When the victim was returned to her home, Ms. Lawson observed that he was crying, shaking, and very upset. That evening, Ms. Lawson took the victim to the hospital. While there, she heard him mention the city park in Bolivar and a "yellowish" condom thrown down at the edge of the woods. On the next afternoon, Ms. Lawson and the victim drove to the city park and found the yellow condom in the area described by the victim. The police, who were called to the scene, took possession of the condom.

The victim testified that during May of 1998, he and the defendant sang at his sister's dance recital. The victim recalled that he had rehearsed with the defendant at the dance stages in Bolivar. After the recital, the defendant asked the victim to join the Savannah choir for a concert. The victim agreed to participate and accompanied the defendant on his trips to and from Savannah for rehearsal. The defendant usually picked up the victim at 5:00 or 6:00 p.m. and returned him to his home at 10:00 or 11:00 p.m. The victim estimated that they made between five and ten trips together. Occasionally, their return from Savannah was so late at night that the victim chose to spend the night at the defendant's residence rather than return to his own home. The victim confirmed the testimony of his mother, Ms. Lawson, regarding his telephone call from the defendant's home and the subsequent developments. He recalled that while at the hospital, he related the details of his encounters with the defendant. The next day, he accompanied his mother to the Bolivar city park. The victim directed his mother to a condom located at the edge of the woods near the picnic tables. The victim testified that the condom had been left in the park by the defendant on June 15, 1998.[2] He recalled that during the early afternoon on that date, he was alone when the defendant arrived at his residence. The victim and the defendant were watching television when the victim's father arrived to take the family dog to the veterinarian. Before leaving, Mr. Lawson instructed the victim to clean the house. While the victim was cleaning the living room, the defendant, who was sitting on the couch, "told [the victim] to sit down because [the victim] was starting to look good to him and . . . was making him horny." The victim testified that he was sitting on the opposite end of the couch when the defendant pulled him by his shirt and instructed him to sit on his lap. The victim related that the defendant then lowered the victim's pants and placed his mouth on the victim's penis. Three or four minutes later, a neighbor knocked on the door and the victim jumped up, pulled up his pants, and ran to his room. When he looked out the window and did not see any vehicles in the driveway, the victim returned to the living room. The defendant, who answered the door, allowed

---

[2]The victim could not recall the exact date; however, he recalled that his father had taken the family dog to the veterinarian on that day. His mother, Melinda Lawson, testified that her husband took the dog to the veterinarian on June 15.

the neighbor into the house. After the neighbor had used the phone and left, the victim returned to his room to dress for choir practice, during which time both his mother and father returned to the house. The victim then left with the defendant for choir practice in Savannah.

On their return to Bolivar after choir practice, the defendant stopped at a Sonic restaurant in Selmer. According to the victim, the defendant purchased their food. Afterward, the defendant stopped at a convenience market and purchased beer, which he gave to the victim. The victim testified that he "took like two drinks" before the defendant drove to the Bolivar city park. After stopping the van, the defendant stepped out and stood at the rear of the vehicle. When the victim walked over to the defendant, the defendant pulled the victim over to a picnic table, lowered the victim's pants, and placed his mouth on the victim's penis. The victim testified that after two or three minutes, he pushed the defendant's head up and the defendant responded by removing a condom from his pocket, placing it on his penis, and attempting anal penetration of the victim. Notwithstanding an earlier, contrary statement to police officers, the victim testified that the defendant's penis actually penetrated his rectum. The victim testified that he directed the defendant to stop because of the pain. The victim recalled that the defendant then removed the condom, walked to the edge of the woods, and threw the condom to the ground. The victim explained that he did not immediately reveal the June 15 incidents involving the defendant because he "was scared of what was going to happen if the police got involved." The victim also recalled being embarrassed about the events and nervous regarding statements by the defendant to the effect that "[the defendant] thought he was falling in love with [him], and whenever love was broken, it could cause death."

On cross-examination, the victim acknowledged that he told neither the neighbor who came to his house to use the telephone nor his father about the oral sex incident that had occurred prior to choir practice on June 15. He further acknowledged that he willingly traveled with the defendant to Savannah even after the oral sex incident. Finally, he conceded that after the defendant had been charged with the crimes, he telephoned the defendant to apologize.

Lawrence Sain, a friend of the defendant, was called as a witness for the state to testify as to a conversation he had with the defendant shortly after his arrest. Sain recalled that the defendant admitted that he had been accused of rape, but contended "[t]hat it was willing; that it wasn't rape." He also recalled that the defendant had suggested that the victim had accused him of rape because he had planned to move from the area. Crystal Barrett, who accompanied Sain to the defendant's residence, was also called as a state witness. Ms. Barrett recalled that the defendant denied guilt because the sexual encounters had been consensual.

Captain Bill Irons, who investigated the crimes for the Bolivar Police Department, testified that, as part of his investigation, he instructed the victim to call the defendant and apologize in hopes that the defendant would implicate himself during the conversation. Captain Irons tape recorded the conversation, but the tape contained nothing useful to the police.

Sergeant Mike Jones of the Bolivar Police Department testified that he recovered a condom at the edge of the woods in the Bolivar city park on June 27, 1998. The condom was sealed in an

evidence envelope and sent to the Tennessee Bureau of Investigation laboratory for analysis. Chad Johnson, a forensic scientist with the T.B.I., testified that there was no semen detected on the condom recovered by Sergeant Jones. T.B.I. laboratory technicians attempted to extract DNA from possible human cells present on the condom, but were unsuccessful in their efforts. Special Agent Johnson described the condom as being brittle, having debris such as grass and dirt on it. According to Special Agent Johnson, that was consistent with the condom's having been exposed to the elements for several days. Under those circumstances, he was not surprised at the lack of evidence on the condom.

After the state rested and the defendant's motion for judgment of acquittal was denied, the defense called Camille Wooden. Ms. Wooden, married to the pastor of the church in Savannah, testified that she had seen the victim at choir practice with the defendant on only two or three occasions. She recalled that choir practice started in May of 1998, but that the victim did not begin attending until June. While acknowledging that there were no attendance records, she stated that the victim's presence was evident because the victim was white and the other participants were black. According to Ms. Wooden, the defendant explained that the victim was participating only because they had been rehearsing for a concert or a talent show and there was no one else at the victim's residence during choir practice.

Against the advice of his counsel, the defendant, who was 28 years of age at the time of trial, testified on his own behalf. He stated that he began working on voice lessons with the victim at the beginning of May of 1998, when the victim and his mother asked for his assistance in preparing the victim for a singing performance at a dance recital. The defendant testified that he generally had two days per week off from work and that he usually spent one of those days rehearsing for the recital with the victim. The defendant maintained that on June 15, he arrived at the victim's home at 5:00 p.m. to pick up the victim for choir practice in Savannah. He claimed that the victim, who was watching television, stated that he had just spoken by telephone with his father, who was on the way home. The defendant recalled that at that point, a neighbor knocked on the door, asked to use the telephone, completed her call, spoke briefly with the defendant and the victim, and then left. According to the defendant, the victim's father arrived at the house immediately following the neighbor's departure. The defendant testified that while he was speaking with the victim's father, the victim remarked, "Come on. We're going to be late." The defendant claimed that when he and the victim returned to Bolivar after choir practice, the victim did not "feel like going home because there's nothing to do." The defendant contended that he nevertheless transported the victim directly to his residence and then went inside to speak to the victim's parents, as was his custom. The defendant explained that the victim received little attention from his parents. He specifically denied any sexual contact with the victim.

On cross-examination, the defendant, who said that he considered himself an "older brother" to the victim, admitted that he had been to the city park with the victim on one occasion sometime at the end of May or the beginning of June, 1998. He further acknowledged that he was aware that the victim was 14 years of age at the time. The defendant contended, however, that on June 26, when he called his mother to pick him up, the victim was distraught because he "had grown attached

to [the defendant] . . . [a]nd he knew that the defendant was getting ready to leave." The defendant testified that the victim had wanted to spend the night at his house. He contended that when the victim learned that the defendant had already called his father to tell him that they were on their way to the Lawson residence, the victim became "upset and started cursing [the defendant] out." The defendant insisted that when he again called the victim's father and informed him of the victim's behavior, Mr. Lawson responded that he would call him back. Later, the victim was still "cursing [the defendant] out," and went for a walk; when he returned, he placed two telephone calls and then sat down outside. The defendant informed the victim that his brother was coming to give him a ride. The defendant claimed that he then asked the victim what was wrong and the victim responded, "Well, I am having some problems at home, but I don't want to talk about it right now," then continued to curse at him. When the victim's brother arrived, the defendant followed their vehicle back to the Lawson residence. The defendant claimed that when he inquired as to whether the victim was okay, he learned of the rape accusations and immediately demanded that the victim be taken to the hospital. During his examination at trial, the defendant denied ever having told Lawrence Sain or Crystal Barrett that he and the victim had been involved in a consensual sexual relationship.

Because the defendant denied having made a statement to Captain Bill Irons after his arrest, Captain Irons was called as a rebuttal witness by the state. Captain Irons testified that after he arrested the defendant and read him his rights, the defendant stated that he had taken the victim to choir practice in Savannah approximately 8 to 10 times. The officer recalled that the defendant admitted that on one occasion, he had taken the victim to the city park in Bolivar rather than driving him directly to his residence. He explained that on that night, the victim "wanted to ride around" rather than go home. The defendant told Captain Irons that he had stopped his vehicle near the picnic tables in the park. According to Captain Irons, the defendant claimed that the victim had merely stepped outside the car to urinate.

The state also called the victim as a rebuttal witness relative to the June 26 events. The victim testified that on that date, he was upset not because the defendant had refused to allow him spend the night, but because the defendant had forced a sexual encounter. According to the victim, he was forced to perform oral sex on the defendant.

I

Initially, the defendant challenges the sufficiency of the evidence. On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). This court may neither reweigh nor reevaluate the evidence; nor may this court substitute its inferences for those drawn by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859

(Tenn. 1956). The evidence is sufficient when a rational trier of fact could conclude that the defendant is guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979). When there is a challenge to the sufficiency of the evidence, the defendant has the burden of demonstrating that the evidence is not sufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The elements of statutory rape are contained in Tenn. Code Ann. § 39-13-506, which provides in pertinent part as follows:

> Statutory rape is sexual penetration of a victim by the defendant or of the defendant by the victim when the victim is at least thirteen (13) but less than eighteen (18) years of age and the defendant is at least four (4) years older than the victim.

Tenn. Code Ann. § 39-13-506(a).

The victim testified that on July 15, 1998, when he was 14 years old, the defendant, who was 27 years old at the time, forced him to engage in two separate sexual encounters: one in which the defendant performed oral sex on the victim at the victim's home, and one in which the defendant performed oral sex on the victim and then attempted to penetrate the victim anally in the Bolivar city park. The victim's testimony that the two had sexual encounters was corroborated, in part, by the weathered condom found by the police in the park and by the defendant's admissions to Lawrence Sain and Crystal Barrett that he had engaged in consensual sex with the victim. There was sufficient evidence, in our view, to support the jury's determination of guilt for two statutory rapes.

Parenthetically, statutory rape is not a lesser included offense of rape. State v. Stokes, 24 S.W.3d 303 (Tenn. 2000). While the defendant was originally charged only with two counts of rape, the indictment was subsequently amended by agreement to include alternative allegations of statutory rape.

II

The defendant next argues that the trial court erred by admitting into evidence two photographs which, notwithstanding an order allowing discovery, were not shown to defense counsel prior to trial. The defendant did not raise this issue in his motion for new trial. As such, it is waived for purposes of appeal. See Tenn. R. App. P. 3(e), 36(a). Nevertheless, we would not have found error even if the issue had been properly preserved.

Rule 16(a)(1)(C) of the Tennessee Rules of Criminal Procedure provides that the defendant is entitled to discover and inspect "books . . . [and] photographs . . . which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial . . . ." Rule 16 goes on to provide that if "a party discovers additional evidence or material previously requested or ordered, which is

subject to discovery or inspection," that party must "promptly notify the other party . . . of the existence of the additional evidence or material." Tenn. R. Crim. P. 16(c).

Nearly five months prior to trial, the trial court entered a pre-trial order which provided that the defendant was granted discovery pursuant to Tenn. R. Crim. P. 16. During trial, the state attempted to introduce two Polaroid photographs: The first photograph shows Sergeant Jones in the Bolivar city park at the edge of the woods where the condom was found, and the second photograph is of the condom itself. Defense counsel objected on the ground that although the assistant district attorney had advised her of the existence of the photographs prior to trial, he had not shown them to her. The trial court overruled the objection and admitted the photographs.

The record contains defense counsel's objection to the admission of the photographs and the state's argument in response thereto. Otherwise, the record contains no information about the nature and timing of defense counsel's discovery-related communications with the assistant district attorney. The defense brief provides that "defense counsel met the district attorney three or four days before trial to obtain last-minute discovery. The district attorney informed her that there were photographs, but he did not provide them." In our view, the state did not violate Tenn. R. Crim. P. 16. The state's duty under Rule 16(a)(1)(C) is to permit the defendant to inspect and copy photographs. The assistant district attorney advised defense counsel that the state anticipated introducing photographs at trial. Nothing in this record suggests that defense counsel wanted to inspect or copy the photographs in advance of trial. Because the record is devoid of any suggestion that the state attempted to conceal or otherwise withhold the photographs from the defendant, the photographs were properly admitted.

Even if there had been a violation of Tenn. R. Crim. P. 16, the defendant would not be entitled to relief. When there has been a failure to produce discoverable material within the allotted time, the trial court has the discretion to fashion an appropriate remedy, such as a continuance. Tenn. R. Crim. P. 16(d)(2). Whether the defendant has been prejudiced by the failure to disclose is always a significant factor. See State v. Baker, 751 S.W.2d 154, 160 (Tenn. Crim. App. 1987). Exclusion of the evidence is a drastic remedy and should not be implemented unless there is no other reasonable alternative. See, e.g., State v. House, 743 S.W.2d 141, 146 (Tenn. 1987). The defendant has failed to explain how he was prejudiced by the trial court's admission of the photographs. The photographs, which were in no way inflammatory, were merely illustrative of the testimony provided by Captain Irons and Sergeant Jones.

III

The defendant next complains that the trial court erred during the voir dire of prospective Juror Daniel, who was ultimately challenged peremptorily, presumably by the defense, and who did not, of course, participate in the trial.

Defense counsel moved to strike Juror Daniel after the following series of questions and answers:

[DEFENSE COUNSEL]: Now, Ms. Daniel, let me ask you this. In your church, have they talked at all about whether they think a homosexual act is a sin?

MS. DANIEL: Yes.

[DEFENSE COUNSEL]: Okay. Tell us. I know you know the answer.

MS. DANIEL: The Bible.

[DEFENSE COUNSEL]: Okay. And let me ask you this. In this trial, would you agree that it's going to be hard for you to find that somebody is not guilty when you think that they're committing a sin?

MS. DANIEL: I think it to be a sin, yes.

After defense counsel's motion to strike, the trial court asked Juror Daniel non-leading questions about any possible conflict between her religious beliefs and her ability to impartially review the evidence and render a verdict:

THE COURT: You understand – Let me ask you this question. Do you understand that . . . according to your religious beliefs, something can be a sin and can also be against the law? Do you understand that?

MS. DANIEL: Yes, sir.

THE COURT: Do you also understand that something can be a sin and not be against the law? Do you understand that? Or something can be against the law and not be a sin. Do you understand that, according to your religious belief?

MS. DANIEL: Yes, sir.

THE COURT: Do you understand here today that if – you are to judge this case only on the question of whether or not these acts are against man's law?

MS. DANIEL: Yes.

THE COURT: Would you be able to do that?

MS. DANIEL: Yes.

In response to the questions, Juror Daniel demonstrated her impartiality as to the guilt or innocence of the defendant.

Generally, the control of voir dire rests within the sound discretion of the trial judge. State v. Jefferson, 529 S.W.2d 674, 682 (Tenn. 1975); State v. Oody, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991); see also Tenn. R. Crim. P. 24. In State v. Irick, our supreme court held as follows:

It is the duty of the trial judge to participate in the examination of prospective jurors. . . . His actions in the conduct of voir dire examination will not be disturbed unless there is an abuse of that discretion.

762 S.W.2d 121, 125 (Tenn. 1988).

A prospective juror who indicates that he has formed an opinion about the case "shall be subject to challenge for cause unless the examination shows unequivocally that the prospective juror can be impartial." Tenn. R. Crim. P. 24(b)(2). Such a prospective juror may be rehabilitated but should not be led into vocalizing impartiality:

> The [Advisory] Commission disapproves of questions tending to lead the prospective juror or suggest partiality in the first instance, and also disapproves of that procedure in "rehabilitating" the prospective juror into vocalizing impartiality. Such a prospective juror shall be held to be qualified only upon a truly unequivocal showing of impartiality.

Tenn. R. Crim. P. 24, Advisory Commission Comments.

In our view, the trial court's questions to Juror Daniel were proper. Moreover, there is no proof that the defense had exercised all of its other peremptory challenges. In State v. Kilburn, this court ruled that in the absence of proof of the exhaustion of all peremptory challenges, the defendant must show actual prejudice or bias in order to obtain relief:

> As a preliminary matter it should be noted there is no proof in this record regarding the use of peremptory challenges by the defendant. The record shows which jurors were excluded, but does not reveal whether the challenge was made by the defendant or the state. Only when a defendant exhausts all his peremptory challenges and is forced to later accept an incompetent juror . . . can he complain about the jury composition. Absent proof on the use of peremptory challenges it is necessary for the defendant to show actual prejudice or bias . . . in order to prevail on his jury complaints.

782 S.W.2d 199, 202 (Tenn. Crim. App. 1989) (citations omitted). As the state points out, the prospective juror about which the defendant complains was peremptorily excused. The defendant does not allege that any other member of the jury was in any way prejudiced, biased, or otherwise incompetent to serve. In consequence, the defendant is not entitled to relief on this ground.

IV

Next, the defendant argues that the trial court erred by denying his motion in limine to prohibit the state from presenting any testimony regarding the events of June 26. While the defendant's motion in limine should have been granted, it is our view that the trial court's error was harmless in the context of the entire trial.

Rule 404 of the Tennessee Rules of Evidence, which governs the admissibility of evidence of other bad acts, provides in pertinent part as follows:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

While there are exceptions, this rule is generally one of exclusion See State v. Parton, 694 S.W.2d 299 (Tenn. 1985); Bunch v. State, 605 S.W.2d 227 (Tenn. 1980); Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963); see also State v. Rickman, 876 S.W.2d 824 (Tenn. 1994). Most authorities suggest that trial courts take a "restrictive approach [to] Rule 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 404.7, at 172 (3d ed. 1995). The exceptions to the rule include other bad acts that are offered to prove motive, identity, intent, absence of mistake, opportunity, or a common scheme or plan. Bunch, 605 S.W.2d at 229. Our supreme court has stated the following with regard to determining the admissibility of evidence of other wrongs:

> [I]f evidence that the defendant has committed a crime separate and distinct from the one on trial is relevant to some matter actually in issue in the case on trial, and if its probative value as evidence is not outweighed by its prejudicial effect upon the defendant, then such evidence may be properly admitted.

State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). When the trial court substantially complies with the requirements of Rule 404(b), review of the trial court's ultimate determination to admit the evidence is on an abuse-of-discretion basis. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Prior to trial, the defendant moved to exclude any testimony regarding the events of June 26 on the grounds that the evidence was irrelevant and that its probative value was outweighed by the danger of unfair prejudice. The state, characterizing the events of the 26th as "fairly disgusting," argued that the evidence was relevant to explain why the incidents that occurred on June 15 were not

reported until the 26th. The trial court, after hearing the arguments of counsel, made the following ruling:

> [W]ith regard to the June 26th event, the Court will allow the State to briefly go into that incident as explanatory of how this matter came to the attention of law enforcement, how it came to the attention of the mother, and brought this whole matter to this court here today, finding that the probative value outweighs the stains of unfair prejudice.

In our view, the trial court erred by admitting testimony regarding the events of June 26. The proof qualified as evidence of an "other wrong" within the meaning of Tenn. R. Evid. 404(b). As such, the trial court had a duty to take a more restrictive approach. That the victim had failed to promptly notify authorities of the June 15 incidents was not an issue presented by the defense; in fact, the state, by introducing proof of the victim's failure to report the June 15 incidents until the 26th, initially raised the question. Moreover, the testimony that the state elicited about the 26th had little to do with a belated notification of authorities. Upon questioning by the state, the victim's mother testified that "something disturbing" had happened on the 26th, that the victim had called her "hysterical" and "screaming," and that she had taken the victim to the hospital. Likewise, the victim testified that he was "[r]eal upset" on the 26th, that he called his mother, and that he went to the hospital. In our assessment, the testimony served to engender speculation by the jury as to the events of the 26th and offered little on the events of June 15. Because its probative value was outweighed by the danger of unfair prejudice, the testimony should have been excluded. Cf. State v. Gilliland, 22 S.W.3d 266 (Tenn. 2000) (holding that contextual background evidence containing proof of other crimes may be offered as Tenn. R. Evid. 404(b) "other purpose" evidence when exclusion of that evidence would create a chronological or conceptual void in presentation likely to result in significant jury confusion concerning material issues or evidence).

Our conclusion is underscored by the fact that the victim provided direct testimony regarding his delay in reporting the incidents of June 15:

> Q.      [I]f this event happened a week or better before you told your mama, why didn't you immediately report it? Why didn't you tell your mama when you got home that next morning or whenever about what [the defendant] had done with you at your house and at the city park?
> A.      Because I was scared of what was going to happen if the police got involved. I didn't know what he was going to do if I would have told somebody and I was like embarrassed and everything.
> Q.      Had [the defendant] said anything to you that caused you nervousness?
> A.      He was talking about that he thought he was falling in love with me, and whenever love was broken, it could cause death.

-11-

Without any reference to the 26th, this testimony by the victim conveyed the victim's reasons for not immediately reporting the incidents of June 15. Nevertheless, none of the testimony presented by the state about the June 26 incident made reference to any type of sexual contact between the defendant and the victim. As such, no evidence of other bad acts was put before the jury as a result of the trial court's ruling. Moreover, there was substantial evidence of the defendant's guilt. The victim's testimony was corroborated by both the condom in the park and the defendant's own admissions to Lawrence Sain and Crystal Barrett. In our view, any error by the admission of the testimony was harmless. See Tenn. R. App. P. 36(b).

V

The defendant next contends that the trial court erred by allowing the victim to testify in rebuttal about the events of June 26th. We disagree.

Relevant evidence is that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable" than it otherwise would be. Tenn. R. Evid. 401. Generally, all relevant evidence is admissible. Tenn. R. Evid. 402. Relevant evidence may be excluded, however, if it presents a danger of unfair prejudice:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Tenn. R. Evid. 403.

Against the advice of his counsel, the defendant testified on his own behalf at trial. During cross-examination, the defendant, who contended that he had never had any sexual contact with the victim, was questioned about the victim's motivation for lying. The defendant responded that the victim had not expressed his motivation, but that he had started to do so on the 26th, "the Friday evening that he was at my house that he supposedly been upset." The assistant district attorney then asked whether the victim was actually upset on the 26th. In response, the defendant testified as to his version of the events of the 26th. Thereafter, the trial court allowed the state to call the victim to rebut the testimony of the defendant with regard to the June 26th incident.

In our view, the victim's rebuttal testimony was properly allowed. The state did not ask improper cross-examination questions concerning June 26. Instead, the defendant presented the issue during cross-examination, characterizing the victim as "supposedly . . . upset." When the assistant district attorney asked follow-up questions, the defendant spontaneously recited his version of the events of the 26th, thereby opening the door to rebuttal testimony.

Although the Tennessee Rules of Evidence govern evidentiary rulings in all trial courts, the rules do not deal to any extent with the issue of rebuttal witnesses and/or rebuttal proof. Neil P. Cohen et al., Tennessee Law of Evidence § 611.9, at 399 (3d ed. 1995). Rule 611(a), which indicates that trial courts shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel, has been interpreted to liberally allow rebuttal proof. Id. Tennessee case law establishes that trial courts have considerable discretion in whether to admit rebuttal witnesses. Id. Courts in this state have consistently held that any competent evidence that explains, directly replies to, or contradicts material evidence introduced by the defense, or which is brought out on the defendant's cross-examination, is admissible in rebuttal. See State v. Smith, 735 S.W.2d 831, 835 (Tenn. Crim. App. 1987); State v. James Morrow, No. W1998-0583-CCA-R3-CD (Tenn. Crim. App., at Jackson, Dec. 29, 1999); State v. Tommy Nunley,

No. 02C01-9804-CR-00114 (Tenn. Crim. App., at Jackson, Mar. 12, 1999); <u>State v. Allan Brooks</u>, No.01C01-9510-CC-00-00324 (Tenn. Crim. App., at Nashville, Oct. 29, 1998). Because the defendant recited the events of the 26th in explanation of the accusations made by the victim, the prosecution was properly allowed to present rebuttal evidence.

Additionally, notwithstanding the graphic nature of the victim's rebuttal testimony, its probative value outweighed the danger of unfair prejudice. The defendant's testimony regarding June 26 was extraordinarily detailed and completely exculpatory. The state was entitled to call the victim to impeach that testimony. Moreover, the trial court gave an appropriate limiting instruction that the victim's rebuttal could be considered only for impeachment purposes. This issue is without merit.

VI

Finally, the defendant asserts that the trial court erred by refusing to suspend the entire sentence. It is our conclusion that the defendant's sentence was proper.

When a challenge is made to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a "de novo review . . . with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d); <u>see also</u> <u>State v. Ashby</u>, 823 S.W.2d 166 (Tenn. 1991). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210.

Especially mitigated or standard offenders convicted of Class C, D, or E felonies are, of course, presumed to be favorable candidates "for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6). With certain statutory exceptions, none of which apply here, probation must be automatically considered by the trial court if the sentence imposed is eight years or less. Tenn. Code Ann. § 40-35-303(b). Among the factors applicable to probation consideration are the circumstances of the offense, the defendant's criminal record, social history, and present condition, and the deterrent effect upon and best interest of the defendant and the public. <u>State v. Grear</u>, 568 S.W.2d 285, 286 (Tenn. 1978).

A sentence of split confinement involves the grant of probation after the partial service of a sentence. Tenn. Code Ann. § 40-35-306. It may include a jail or workhouse sentence of up to one year with the probationary term to extend for any period thereafter up to the statutory maximum for the offense. <u>Id.</u>

The trial court denied the defendant's request for probation:

The Court having recognized the presumption that you are entitled to – presumption that you are a favorable candidate for alternative sentencing, the Court hereby denies same, based on the fact that alternative sentencing or probation in this case would [depreciate] the seriousness of this offense. The seriousness of this offense being not only the abuse of a position of trust the Court finds in this case, but also the . . . psychological damage that's been done to the child involved in this case, as well as the family . . . .

The trial court then sentenced the defendant to the statutory minimum of one year, see Tenn. Code Ann. § 40-35-111(b)(5), on each of his statutory rape convictions and ordered that the sentences run concurrently. Upon the defendant's completion of the sex offender evaluation program, the trial court modified the sentences to require sixty days in the county jail, with the remainder of the one-year concurrent terms to be completed on supervised probation. The trial court denied the defendant's request to serve his entire sentence on probation:

The Court will require the defendant to serve 60 days in the county jail, after which he'll be transferred to Corrections Management Corporation to serve the remainder of his sentence, and undergo sexual offender program. The Court denies that – the probation in this case because the defendant abused a position of trust in this case. It would [depreciate] the seriousness of the offense, and as a general deterrent to others.

In our view, the record supports the trial court's denial of the defendant's request for total probation. Before a trial court can deny alternative sentencing on the basis of deterrence, there must be sufficient evidence in the record such that a reasonable person could conclude that "(1) a need to deter similar crimes is present in the particular community, jurisdiction, or in the state as a whole, and (2) incarceration of the defendant may rationally serve as a deterrent to others similarly situated and likely to commit similar crimes." State v. Hooper, ___ S.W.3d ___, No. M1997-00031-SC-R11-CD, 2000 WL 1357520 (Tenn. Sept. 21, 2000). No such evidence is present in the record. Thus, general deterrence was not a proper ground. Nevertheless, the remaining two factors considered by the trial court, the circumstances of the offense and the need to avoid depreciating the gravity of the offense, were proper factors for the trial court's consideration. See Tenn. Code Ann. § 40-35-103(1)(B); Grear, 568 S.W.2d at 286. Confinement is often necessary to avoid depreciating the seriousness of an offense. For the denial of an alternative sentence on that basis, "the nature of the offense must generally outweigh all factors favoring a sentence other than confinement." State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995). The record here supports the trial court's conclusion that confinement is necessary to avoid depreciating the seriousness of the defendant's offense. The defendant took advantage of the mentor role that he played with regard to the victim. In doing so, he not only abused the trust of the victim, but that of the victim's family as well. Moreover, his confessions to Lawrence Sain and Crystal Barrett notwithstanding, he has continued to deny having had any sexual encounters with the victim. Thus, his candor was at issue. Based on

-15-

the defendant's continuing failure to accept responsibility for his crimes, the trial court properly found that confinement was necessary.

The defendant also maintains that the trial court erred by refusing to hear the testimony of the victim's ten-year-old neighbor, who would have testified that the victim had made homosexual advances toward him. The defendant attempted to call the neighbor to rebut the victim's mother's testimony that the victim had been ridiculed and called a "fag" at school as a result of the defendant's abuse. The defendant contended that the victim was responsible for the ridicule. In our view, the sentence was proper regardless of whether the ridicule was due to the behavior of the defendant or that of the victim. Even if the witness had testified favorably for the defense and his testimony had been accredited by the trial court, the acts of the defendant warranted the sentence imposed.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE